**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| HAZEL TECHNOLOGIES, INC.,[1] | ) | |
| | ) | |
| Debtor. | ) | Case No. 24-11142 (JKS) |
| | ) | |
| | ) | |

**FIRST AMENDED SUBCHAPTER V SMALL BUSINESS PLAN OF**
**REORGANIZATION OF HAZEL TECHNOLOGIES, INC.**

This Plan of Reorganization (the "**Plan**") is presented to you to inform you of the Plan for restructuring of the debts of Hazel Technologies, Inc.

You are encouraged to carefully review the full text of this document, including all exhibits and attachments, before deciding how to vote on the Plan. To assist you in your review, please note that a list of definitions and a section of frequently asked questions appear at the end of this document.

**IN ADDITION TO CASTING YOUR VOTE TO ACCEPT OR REJECT THE PLAN, YOU MAY OBJECT TO CONFIRMATION OF THE PLAN. IF YOU WISH TO OBJECT TO CONFIRMATION OF THE PLAN, YOU MUST DO SO BY SEPTEMBER 23, 2024, AT 4:00 P.M. (ET).**

**YOUR BALLOT STATING HOW YOU ARE VOTING ON THE PLAN MUST BE RETURNED BY SEPTEMBER 23, 2024, AT 4:00 P.M. (ET). THE BALLOT MUST BE MAILED TO HAZEL TECHNOLOGIES, INC. C/O STRETTO, 410 EXCHANGE, SUITE 100, IRVINE, CALIFORNIA 92602 OR SUBMITTED ONLINE VIA HTTPS://BALLOTING.STRETTO.COM.**

**A HEARING ON THE CONFIRMATION OF THE PLAN IS SCHEDULED FOR OCTOBER 2, 2024, AT 11:00 A.M. (ET), IN COURTROOM NO. 6 AT THE U.S. BANKRUPTCY COURT, DISTRICT OF DELAWARE, 824 N. MARKET STREET, WILMINGTON, DELAWARE 19801.**

Your rights may be affected by this Plan. You should consider discussing this document with an attorney.

---

[1] The last four digits of the Debtor's federal tax identification number are 7139. The Debtor's mailing address is 2720 N. Grove Industrial Drive, Unit 101, Fresno, California 93727.

**JENNER & BLOCK LLP**
Catherine L. Steege (admitted *pro hac vice*)
Melissa M. Root (admitted *pro hac vice*)
353 N. Clark Street
Chicago, Illinois 60654
Telephone: (312) 222-9350
Email: csteege@jenner.com
Email: mroot@jenner.com

*Counsel for the Debtor and Debtor in Possession*

**KLEHR HARRISON HARVEY BRANZBURG LLP**
Michael W. Yurkewicz (DE Bar No. 4165)
Domenic E. Pacitti (DE Bar No. 3989)
919 N. Market Street, Suite 1000
Wilmington, Delaware 19801
Telephone: (302) 426-1189
Facsimile: (302) 426-9193
Email: myurkewicz@klehr.com
Email: dpacitti@klehr.com

-and-

Morton R. Branzburg (admitted *pro hac vice*)
1835 Market Street, Suite 1400
Philadelphia, Pennsylvania 19103
Telephone: (215) 569-3007
Facsimile: (215) 568-6603
Email: mbranzburg@klehr.com

Dated: September 27, 2024

## TABLE OF CONTENTS

SUMMARY OF THE PLAN AND DISTRIBUTIONS TO CREDITORS .......................................1

**Article 1 HISTORY OF THE BUSINESS OPERATIONS OF THE DEBTOR**......................1

    1.1    Nature of the Debtor's Business ....................................................................................1

    1.2    History of Business Operations of the Debtor ..............................................................2

    1.3    Filing of the Debtor's Chapter 11 Case .......................................................................2

    1.4    Legal Structure and Ownership ...................................................................................2

    1.5    Debtor's Assets .............................................................................................................3

    1.6    Debtor's Liabilities .......................................................................................................3

    1.7    Current and Historical Financial Conditions ...............................................................4

    1.8    Events Leading to Filing the Chapter 11 Case.............................................................4

    1.9    Significant Events During the Chapter 11 Case ...........................................................4

    1.10    Projected Recovery of Avoidable Transfers ................................................................9

**Article 2 THE PLAN** ............................................................................................................10

    2.1    Unclassified Claims ...................................................................................................10

        A.  Administrative Expenses ......................................................................................10

        B.  Priority Tax Claims ..............................................................................................12

    2.2    Classes of Claims and Equity Interests.....................................................................12

        A.  Class 1: The DIP Lenders' Secured Claim ..........................................................14

        B.  Class 2: Allowed Priority Unsecured Claims ......................................................15

        C.  Class 3: General Unsecured Claims......................................................................15

        D.  Class 4: Equity Interest Holders ..........................................................................16

    2.3    Estimated Number and Amount of Claims Objections...............................................18

    2.4    Treatment of Executory Contracts and Unexpired Leases .........................................18

        A.  Assumption of Executory Contracts and Unexpired Lease ..................................18

      B.  Rejection of Executory Contracts and Unexpired Leases ............................................18

**Article 3 MEANS FOR IMPLEMENTATION OF THE PLAN** ............................................19

3.1    Reorganization of the Debtor as the Reorganized Debtor ............................................19

3.2    Cancellation of Notes, Instruments, Certificates, and Other Documents ...................19

3.3    Exemption from Certain Taxes and Fees ....................................................................19

3.4    Sources of Consideration for Plan Distributions ........................................................20

3.5    Reorganized Debtor .....................................................................................................20

3.6    Dissolution of Existing Board of Directors and Establishment of New Board of Directors ...................................................................................................................20

3.7    Release of Liens ...........................................................................................................21

3.8    Corporate Action ..........................................................................................................21

3.9    Effectuating Documents; Further Transactions ..........................................................21

3.10   Closing the Chapter 11 Case ........................................................................................21

3.11   Corporate Existence .....................................................................................................22

3.12   Vesting of Assets in the Reorganized Debtor ............................................................22

3.13   New Organizational Documents ..................................................................................22

3.14   Effectuating Documents; Further Transactions ..........................................................22

3.15   Preservation of Causes of Action ................................................................................23

3.16   Reporting Upon Emergence .........................................................................................23

3.17   Issuance of the New Preferred Shares and Terms Applicable to New Preferred Shares .........................................................................................................................24

3.18   Preferred Dividend .......................................................................................................24

3.19   Liquidation Preference .................................................................................................24

3.20   Future Equity Raises. ...................................................................................................24

3.21   Right of First Refusal/Right of Co-Sale ......................................................................24

      A.  Optional Conversion .............................................................................................25

B.  Anti-Dilution Provisions .................................................................................25

C.  Drag Along...........................................................................................................25

3.22  Payments .................................................................................................................25

3.23  Post-Confirmation Management ............................................................................25

3.24  Tax Consequences of the Plan ...............................................................................25

3.25  Projections in Support of Debtor's Ability to Make Payments Under the
Proposed Plan...........................................................................................................25

**Article 4 FEASIBILITY OF PLAN** ................................................................................26

4.1  Ability to Initially Fund Plan .................................................................................26

4.2  Ability to Make Future Plan Payments and Operate Without Further
Reorganization.........................................................................................................26

**Article 5 LIQUIDATION ANALYSIS** ..........................................................................26

**Article 6 DISCHARGE** .....................................................................................................27

**Article 7 GENERAL PROVISIONS** ...............................................................................27

7.1  Binding Effect ..........................................................................................................27

7.2  Severability ..............................................................................................................27

7.3  Retention of Jurisdiction by the Bankruptcy Court .......................................27

7.4  Captions.....................................................................................................................27

7.5  Modification of Plan................................................................................................28

7.6  Final Decree .............................................................................................................28

7.7  Exculpation ..............................................................................................................28

7.8  Injunction .................................................................................................................28

**Article 8 ATTACHMENTS** ...............................................................................................29

**Article 9 FREQUENTLY ASKED QUESTIONS** ........................................................29

**Article 10 DEFINITIONS** .................................................................................................31

10.1  Administrative Claim or Administrative Expense ......................................31

10.2    Administrative Claimant ...............................................................................31

10.3    Administrative Tax Claim ..............................................................................31

10.4    Allowed Unsecured Claim .............................................................................31

10.5    Avoidance Actions .........................................................................................31

10.6    Bankruptcy Code ...........................................................................................31

10.7    Bankruptcy Court ...........................................................................................31

10.8    Cash ................................................................................................................31

10.9    Causes of Action ............................................................................................31

10.10   Chapter 11 Case or Case ...............................................................................32

10.11   Claim ..............................................................................................................32

10.12   Claimant .........................................................................................................32

10.13   Claims Objection Deadline ...........................................................................32

10.14   Class ...............................................................................................................32

10.15   Confirmation ..................................................................................................32

10.16   Confirmation Date .........................................................................................32

10.17   Confirmation Order ........................................................................................32

10.18   Creditor ..........................................................................................................32

10.19   Cure ................................................................................................................32

10.20   Debtor and Debtor in Possession ..................................................................33

10.21   Deemed Liquidation Event ............................................................................33

10.22   DIP Credit Facility .........................................................................................33

10.23   DIP Lenders ...................................................................................................33

10.24   DIP Lenders' Secured Claim .........................................................................33

10.25   Disposable Income .........................................................................................33

10.26   Disputed Claim ..............................................................................................33

10.27  Distribution Date ...................................................................................33

10.28  Distributions ........................................................................................34

10.29  Effective Date .......................................................................................34

10.30  Entity ...................................................................................................34

10.31  Equity Interest ......................................................................................34

10.32  Estate ...................................................................................................34

10.33  Exculpated Claim .................................................................................34

10.34  Exculpated Parties ...............................................................................34

10.35  Executory Contracts .............................................................................34

10.36  Existing Investors .................................................................................34

10.37  Fee Application .....................................................................................34

10.38  Final Order ...........................................................................................34

10.39  General Claims Bar Date ......................................................................34

10.40  General Unsecured Claim .....................................................................34

10.41  Governmental Claims Bar Date .............................................................35

10.42  Holder ..................................................................................................35

10.43  Impaired ...............................................................................................35

10.44  New Board of Directors ........................................................................35

10.45  New Preferred Shares ...........................................................................35

10.46  New Preferred Shares Infusion .............................................................35

10.47  New Preferred Shares Participants.........................................................35

10.48  Original Purchase Price.........................................................................35

10.49  Payment Period .....................................................................................35

10.50  Petition Date .........................................................................................35

10.51  Plan ......................................................................................................35

10.52    Plan Supplement ................................................................................................35

10.53    Priority Tax Claim ..............................................................................................36

10.54    Priority Unsecured Claim ...................................................................................36

10.55    Professional ........................................................................................................36

10.56    Professional Fee Bar Date ..................................................................................36

10.57    Professional Fee Claims .....................................................................................36

10.58    Proof of Claim ....................................................................................................36

10.59    Record Date ........................................................................................................36

10.60    Rejected Contract ...............................................................................................36

10.61    Rejection Claim ..................................................................................................36

10.62    Reorganized Debtor ...........................................................................................36

10.63    Schedules ............................................................................................................36

10.64    Secured Claim .....................................................................................................36

10.65    Subchapter V Trustee .........................................................................................36

10.66    Unimpaired .........................................................................................................37

10.67    United States Trustee or U.S. Trustee ................................................................37

10.68    Unsecured Creditor .............................................................................................37

## SUMMARY OF THE PLAN AND DISTRIBUTIONS TO CREDITORS

Under the Plan, Hazel Technologies, Inc. ("**Hazel**" or the "**Debtor**") will devote all of its Disposable Income toward the payment of Creditors over a period up to five years, in accordance with section 1191 of the Bankruptcy Code. The Plan provides for full payment of Administrative Expenses, Priority Tax Claims, and Priority Unsecured Claims on the terms set forth below, and projects, but does not guarantee, full payment to General Unsecured Claims in Distributions over time.

The Plan will be funded by: (i) Cash on hand on the Effective Date; (ii) the DIP Lenders' conversion of the entire DIP Credit Facility plus accrued interest into newly authorized class of Series AA Preferred Participating Stock ("**New Preferred Shares**") in the Reorganized Debtor; (iii) the issuance (the "**New Preferred Shares Infusion**") of up to an additional Seven Million Dollars ($7,000,000.00), but no less than Five Million Dollars ($5,000,000.00) of New Preferred Shares in the Reorganized Debtor to be purchased by the DIP Lenders at the "**Original Purchase Price**," which Original Purchase Price will be based upon a fully-diluted pre-money valuation of One Million Dollars ($1,000,000.00), including an unissued and unallocated employee stock incentive plan pool representing 7.5% of the fully-diluted post-money capitalization; and (iv) the Disposable Income generated by the Reorganized Debtor over the proposed Payment Period.

Holders of common Equity Interests in the Debtor as of the Record Date, including the DIP Lenders, will retain their common stock (after accounting for a reverse split at 1:100) in the Reorganized Debtor. Holders of preferred Equity Interests in the Debtor as of the Record Date will have their preferred Equity Interests converted into newly issued common stock of the Reorganized Debtor, in the ratios set forth in the Debtor's certificate of incorporation, which shares then will be reverse split at 1:100 (as set forth below in Section 2.2(D)). Holders of common or preferred Equity Interests in the Debtor as of the Record Date, excluding the DIP Lenders (the "**Existing Investors**"), may participate in the New Preferred Shares Infusion for up to Two Million Dollars ($2,000,000.00) in New Preferred Shares on a *pro rata* basis at the Original Purchase Price. If the Reorganized Debtor has not raised Two Million Dollars ($2,000,000.00) from the Existing Investors, the Reorganized Debtor may, but shall not be required to, sell the unsubscribed portion of such New Preferred Shares to new investors mutually acceptable to the Reorganized Debtor and the DIP Lenders within 120 days of the Effective Date.

## ARTICLE 1
## HISTORY OF THE BUSINESS OPERATIONS OF THE DEBTOR

### 1.1    Nature of the Debtor's Business

Hazel is focused on developing solutions to reduce waste across all stages of the produce transit process. Hazel sells products that extend the shelf life of fresh fruits, vegetables, and flowers (the fruits, vegetables, and flowers treated by the respective product lines, the "**Subject Commodities**"). The additional shelf life that Hazel's products provide permits the growers, packers, shippers, and retailers of the Subject Commodities to improve their quality and operating margins. Prior to the Petition Date, Hazel primarily sold two product lines: Hazel 100™ ("**Hazel 100**") and Hazel Breatheway® ("**Breatheway**").

Hazel 100 is a sachet (packet) placed in a bin or box of produce. Hazel 100 releases 1-methycyclopropene ("**1-MCP**"), a volatile gas. When placed in the presence of the Subject Commodities, 1-MCP inhibits the release and absorption of a plant hormone that causes the Subject Commodities to ripen for an amount of time that differs on a commodity-by-commodity basis. 1-MCP is regulated in most jurisdictions around the world. In the United States, 1-MCP is regulated by the U.S. Environmental Protection Agency.

Breatheway is a modified atmosphere packaging product, placed on the exterior of packaging of the Subject Commodities. Breatheway is designed to help the Subject Commodities remain higher in quality and more resilient despite potentially damaging temperature fluctuations that can occur during transit.

## 1.2    History of Business Operations of the Debtor

Hazel was founded in 2015 by a team of Northwestern University graduates, with a mission to implement scalable solutions to the global food waste crisis. Hazel developed its Hazel 100 line and over time, Hazel and its subsidiaries have achieved a multi-national presence collaborating with some of the world's largest and most progressive growers, shippers, and retailers. Hazel's foreign subsidiaries are not currently in insolvency proceedings.

In 2022, Hazel acquired the Breatheway product line and related assets from Curation Foods, Inc. and Lifecore Biomedical, Inc. (f/k/a Landec Corporation).

As set forth in more detail below, the Debtor's go-forward business strategy is focused on Breatheway.

## 1.3    Filing of the Debtor's Chapter 11 Case

On June 3, 2024, the Debtor filed a voluntary petition for relief under subchapter V of chapter 11 of the Bankruptcy Code. The Chapter 11 Case is pending in the Bankruptcy Court in the District of Delaware. On June 3, 2024, the U.S. Trustee appointed Jami Nimeroff of Brown McGarry Nimeroff LLC to serve as the Subchapter V Trustee in this case. No other trustee, examiner, or official committee has been appointed in this case.

## 1.4    Legal Structure and Ownership

The Debtor is a privately held corporation organized under the laws of Delaware. The Debtor is the successor-in-interest to Hazel Technologies, LLC, an Illinois limited liability company that merged with and into the Debtor in February 2017.

The Debtor's Equity Interests consist of: (a) 859,017 shares of Common Stock; (b) 241,798 shares of Series Seed Preferred Stock; (c) 463,757 shares of Series A Preferred Stock; (d) 967,069 shares of Series B Preferred Stock; (e) 955,022 shares of Series C Preferred Stock; (f) 725,341 shares of Series C-1 Preferred Stock; and (g) 1,234,586 shares of Series D Preferred Stock.

The Debtor owns a number of non-debtor domestic and foreign entities which are not debtors and not subject to insolvency proceedings in their respective foreign jurisdictions. A chart showing the Debtor's corporate structure as of the Petition Date is attached hereto as **Exhibit A**.

For the avoidance of doubt, the Debtor's ownership interests in the non-debtor domestic and foreign entities identified on **Exhibit A** shall be transferred to, and vest in, the Reorganized Debtor on the Effective Date.

## 1.5    Debtor's Assets

The Debtor filed detailed Schedules with the Bankruptcy Court on June 28, 2024 [D.I. 121]. The Schedules set forth the Debtor's assets and liabilities as of the Petition Date. The Debtor's assets include Cash; accounts receivable; security deposits held by other parties; investments; inventory; office furniture, fixtures, and equipment; machinery and equipment; real property; intellectual property; unused net operating losses; and research and development credits. The value of these assets is described in **Article 4** hereof.

## 1.6    Debtor's Liabilities

As of the date hereof, the General Claims Bar Date has passed, but the Governmental Claims Bar Date has not expired. The Debtor's claim register reflects $1,051,646.92 in timely filed proofs of claim asserting General Unsecured Claims. As of the date of this Plan, an additional $4,594,021.88 in rejection damages claims were timely filed.

As of the Petition Date, and as disclosed in the Debtor's Schedules, the Debtor had no secured debt. The Debtor has approximately $1.70 million in unsecured debt of non-insiders, consisting mostly of trade debt owed to various vendors, service providers, and Claims reflected in the Debtor's current accounts payable or otherwise accrued and/or attributable to the period prior to the Petition Date. As of the Petition Date, the Debtor was party to three (3) real property leases and two (2) personal property leases (collectively, the "**Leases**"):

  a.  2720 N. Grove Industrial Drive, Suite 101, Fresno, California 93727 (the "**Fresno Lease**"). The lessor of the Fresno Lease is Fresno-Aid Ltd. The Debtor intends to assume the Fresno Lease.

  b.  320 N. Sangamon Street, Floors 3 and 4, Chicago, Illinois 60607 (the "**Sangamon Lease**"). The lessor of the Sangamon Lease is 320 N. Sangamon Owner, L.L.C. As described further below, the Debtor rejected the Sangamon Lease in the *Debtor's Motion for Entry of an Order (I) Authorizing the Rejection of the Sangamon Lease and Abandonment of Certain Personal Property Effective as of June 28, 2024; and (II) Granting Related Relief* [D.I. 98] (the "**Sangamon Lease Rejection Motion**"), which was approved by the Bankruptcy Court on July 17, 2024 [D.I. 156] (the "**Sangamon Lease Rejection Order**").

  c.  238 Olds Station Road, Office 105 within Suite A, Wenatchee, Washington 98801 (the "**Chelan Lease**"). The lessor of the Chelan Lease is Chelan Douglas Regional Port Authority. The Debtor rejected the Chelan Lease in the *Debtor's First Omnibus Motion for Entry of an Order Authorizing the Rejection of Certain Executory Contracts and an Unexpired Lease, Effective as of the Petition Date* [D.I. 102] (the "**First Rejection Motion**"), which was approved

by the Bankruptcy Court on July 17, 2024 [D.I. 157] (the "**First Rejection Order**").

    d.    Further, the Debtor leased a range of cold storage equipment under the two (2) personal property lease agreements (the "**Equipment Leases**"). The lessors of the Equipment Leases were A&M Cold Storage, LLC dba A&M Cold Storage & Trailer Leasing and Integra Specialty Products, a division of Desiccare, Inc., the latter of which the Debtor rejected pursuant to the First Rejection Motion and First Rejection Order. Hazel included the lease with A&M Cold Storage, LLC dba A&M Cold Storage in the list of contracts to be rejected in **Exhibit D**.

## 1.7    Current and Historical Financial Conditions

The Debtor's financial condition is reflected in the Debtor's most recently filed monthly operating report, attached hereto as **Exhibit B**.

## 1.8    Events Leading to Filing the Chapter 11 Case

As stated above, prior to the commencement of Hazel's bankruptcy case, Hazel primarily sold the Hazel 100 and Breatheway product lines. However, as a result of a significant downturn in the venture capital fundraising market, a slower than expected regulatory approval process for the Hazel 100 product line, and other market pressures, Hazel began experiencing difficulty sustaining the growth and venture capital financing required to maintain its existing business operations. Accordingly, Hazel, in consultation with its Board of Directors and advisors, determined that its best go-forward path was to focus its sales and product development efforts on the Breatheway product line. Hazel believes that the Breatheway product line will be a viable, sustainable, and competitive business.

During the prepetition period, Hazel undertook several steps to further its Breatheway go-forward strategy, including reducing the number of employees from 53 to 27,[2] vacating its Chicago headquarters, and moving its essential operations to its Fresno, California, office, and securing postpetition debtor-in-possession financing. Hazel then elected to file a voluntary petition under subchapter V of chapter 11 of the Bankruptcy Code to implement the automatic stay and provide the Debtor with the necessary breathing room to successfully complete its restructuring.

## 1.9    Significant Events During the Chapter 11 Case

The Debtor has taken several steps in the Chapter 11 Case to implement the restructuring transactions proposed under this Plan. Upon commencing the Chapter 11 Case, the Debtor sought a number of orders from the Bankruptcy Court to ensure a smooth transition of its operations into Chapter 11 and facilitate the administration of the Chapter 11 Case. Certain of these motions are briefly summarized below.

---

[2] The Debtor employs 25 people as of August 22, 2024, as well as contractors devoting substantially all of their professional time to the Debtor.

a.  *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing, but not Directing, the Payment of Certain Prepetition Taxes and Fees, and (II) Granting Related Relief* [D.I. 4] (the "**Taxes Motion**"). The Bankruptcy Court entered an interim order approving the Taxes Motion on June 6, 2024 [D.I. 48], and a Final Order approving the Taxes Motion on June 27, 2024 [D.I. 105] (such orders, together, the "**Taxes Orders**").

The Taxes Orders authorized the Debtor to pay certain accrued and outstanding prepetition taxes and fees in the interim and final periods.

b.  *Debtor's Motion for Entry of Interim and Final Orders (I) Approving Debtor's Proposed Form of Adequate Assurance of Payment to Utility Providers; (II) Establishing Procedures for Determining Adequate Assurance of Payment for Future Utility Services; (III) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Service; and (IV) Granting Related Relief* [D.I. 5] (the "**Utilities Motion**"). The Bankruptcy Court entered an interim order approving the Utilities Motion on June 6, 2024 [D.I. 50], and a Final Order approving the Utilities Motion on June 27, 2024 [D.I. 106] (such orders, together, the "**Utilities Orders**").

The Utilities Orders approved the Debtor's proposed form of adequate assurance of payment to utility providers; established procedures for determining adequate assurance of payment for future utility services; and prohibited utility providers from altering, refusing, or disconnecting utility services on account of outstanding prepetition invoices.

c.  *Debtor's Motion for Interim and Final Orders (I) Authorizing, but not Directing, the Debtor to (A) Continue to Maintain Its Insurance Policies and Programs, and (B) Honor All Obligations with Respect Thereto, (II) Modifying the Automatic Stay with Respect to the Workers' Compensation Program, and (III) Granting Related Relief* [D.I. 8] (the "**Insurance Motion**"). The Bankruptcy Court entered an interim order approving the Insurance Motion on June 6, 2024 [D.I. 51], and a Final Order approving the Insurance Motion on June 27, 2024 [D.I. 107] (such orders, together, the "**Insurance Orders**").

The Insurance Orders authorized the Debtor to continue to maintain its insurance programs and honor related prepetition obligations; renew, supplement, modify, extend, or purchase insurance coverage in the ordinary course of business on a postpetition basis; and make payments under its workers' compensation program on an uninterrupted basis postpetition.

d.  *Debtor's Motion for Interim and Final Orders (I) Authorizing Payment of Prepetition Obligations Owed to Trade Creditors in the Ordinary Course of Business, (II) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers, and (III) Granting Related Relief* [D.I. 9] (the "**Critical Vendors Motion**"). The Bankruptcy Court entered an interim order approving the Critical Vendors Motion on June 6, 2024 [D.I. 49], and a Final Order

approving the Critical Vendors Motion on June 27, 2024 [D.I. 111] (such orders, together, the "**Critical Vendors Orders**").

The Critical Vendors Orders authorized the Debtor to pay certain allowed prepetition Claims of trade Creditors that provide critical goods or services in a total aggregate amount not to exceed $100,000.00 on an interim basis and $201,000.00 on a final basis. The Critical Vendors Orders also authorized financial institutions to honor and process related checks and transfers in connection with payments to trade vendors.

e.  *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing Debtor to (A) Continue Using Existing Cash Management System, Bank Accounts and Business Forms, and (B) Continue Intercompany Transactions; (II) Authorizing Debtor's Banks to Honor All Related Payment Requests; and (III) Granting Related Relief* [D.I. 10] (the "**Cash Management Motion**"). The Bankruptcy Court entered an interim order approving the Cash Management Motion on June 6, 2024 [D.I. 43], and a Final Order approving the Cash Management Motion on June 27, 2024 [D.I. 109] (such orders, together, the "**Cash Management Orders**").

The Cash Management Orders authorized the Debtor to continue using its cash management system, honor certain prepetition obligations related thereto in an amount not to exceed $500.00 on an interim basis, maintain current business forms without reference to the Debtor's status as a debtor in possession, and continue performing ordinary course intercompany transactions. The Cash Management Orders also authorized the Debtor's banks to continue to charge bank fees.

In connection with the Cash Management Motion and the relief granted in the Cash Management Orders, on June 26, 2024, the Debtor filed the *Motion for Entry of an Order Approving Stipulation and Agreement Between Debtor and JPMorgan Chase Bank, N.A. and Lifting Automatic Stay* [D.I. 101] (the "**Stipulation Motion**"). The Bankruptcy Court entered an order approving the Stipulation Motion on July 15, 2024 [D.I. 142].

The Stipulation Motion modified the automatic stay in connection with a letter of credit issued by JPMorgan Chase Bank, N.A. ("**JPMC**") to allow JPMC to apply funds from the Debtor's bank account at JPMC to satisfy a valid draw request from the landlord of the premises formerly leased by the Debtor and subject to the Sangamon Lease or to satisfy JPMC's resulting Secured Claim under the letter of credit without seeking further relief from the automatic stay and without the Debtor's further consent or further order of this Bankruptcy Court.

f.  *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing Debtor to (A) Pay Certain Prepetition Wages and Reimbursable Employee Expenses, (B) Pay and Honor Employee Benefits and (C) Continue Employee Benefits*

*Programs; (II) Authorizing and Directing Financial Institutions to Honor All Related Checks and Electronic Payment Requests; and (III) Granting Related Relief* [D.I. 13] (the "**Wages Motion**"). The Bankruptcy Court entered an interim order approving the Wages Motion on June 6, 2024 [D.I. 44], and a Final Order approving the Wages Motion on June 27, 2024 [D.I. 108] (such orders, together, the "**Wages Orders**").

The Wages Orders authorized the Debtor to pay certain prepetition wages, salaries, and other related compensation; pay and honor obligations relating to employee benefits programs; and continue its employee benefits programs on a post-petition basis. The Wages Orders also authorized and directed final institutions to receive, process, honor, and pay all checks issued and electronic requests made relating to the foregoing.

Although not "first day" motions, on the Petition Date, the Debtor filed two additional motions to facilitate their business operations in chapter 11:

a.  *Debtor's Emergency Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105 and 364 (I) Authorizing the Debtor to Obtain Secured Postpetition Financing; (II) Granting Liens and Providing Superpriority Administrative Expense Status; (III) Granting Adequate Protection; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* [D.I. 11] (the "**DIP Financing Motion**"). The Bankruptcy Court entered an interim order approving the DIP Financing Motion on June 5, 2024 [D.I. 35], and a Final Order approving the DIP Financing Motion on June 27, 2024 [D.I. 113] (such orders, together, the "**DIP Financing Orders**").

The DIP Financing Orders authorized the Debtor to obtain post-petition financing from Pontifax Global Food and Agriculture Technology Fund II and its affiliates as managed by Ailment Capital, LLC; and S2G Builders Food & Agriculture Fund III, LP and its affiliates, the DIP Lenders, on an interim basis up to $1,500,000.00 and on a final basis up to $4,000,000.00 ($3,000,000.00 from the DIP Lenders, subject to increase to $4,000,000.00 depending on participation of additional lenders). The Debtor and DIP Lenders executed the Debtor-In-Possession Loan and Security Agreement attached to the Final Order on June 28, 2024.

b.  *Debtor's Emergency Motion for Entry of an Order (I) Authorizing the Debtor to Assume the Auction Agreement with SIGMA Equipment, Inc., (II) Authorizing the Sale of Certain of the Debtor's Assets Free and Clear, and (III) Granting Related Relief* [D.I. 15] (the "**SIGMA Agreement Assumption Motion**"). The Bankruptcy Court entered an order approving the SIGMA Agreement Assumption Motion on June 13, 2024 [D.I. 73].

The SIGMA Agreement Assumption Motion sought authority to assume one Executory Contract with SIGMA Equipment, Inc. ("**SIGMA**"), a leading auction house and equipment marketplace, permitting SIGMA to conduct an

online auction of the Debtor's laboratory, research and development, packaging, and ancillary equipment (the "**Equipment**") located at the Sangamon Lease property.

Following the completion of the sale process, SIGMA will prepare, and the Debtor will file with the Bankruptcy Court, a report that identifies (a) the Equipment sold pursuant to the terms set forth in the auction agreement, (b) the sale prices for the Equipment, and (c) the commission and fees and reimbursement of expenses with respect to each transaction (or in the aggregate with respect to expenses if not directly incurred in connection with selling Equipment).

Also, at the beginning of the Chapter 11 Case, the Debtor retained certain Professionals to implement its restructuring. To this end, the Debtor filed the following applications:

a. *Debtor's Application for Entry of an Order Authorizing the Retention and Employment of Jenner & Block LLP as Attorneys for the Debtor and Debtor in Possession, Effective as of the Petition Date* [D.I. 99] (the "**Jenner Retention Application**"). The Bankruptcy Court entered an order approving the Jenner Retention Application on July 16, 2024 [D.I. 141].

b. *Debtor's Application Seeking an Order Authorizing the Retention and Employment of Klehr Harrison Harvey Branzburg LLP as Co-Counsel for the Debtor and Debtor in Possession Effective as of the Petition Date* [D.I. 100] (the "**Klehr Retention Application**"). The Bankruptcy Court entered an order approving the Klehr Retention Application on July 12, 2024 [D.I. 138].

c. *Debtor's Application for an Order Authorizing the Retention and Employment of Rock Creek Advisors, LLC, as Financial Advisor for the Debtor and Debtor in Possession, Effective as of the Petition Date* [D.I. 97] (the "**Rock Creek Retention Application**"). The Bankruptcy Court entered an order approving the Rock Creek Retention Application on July 12, 2024 [D.I. 137].

d. *Debtor's Application for Appointment of Stretto, Inc. as Claims and Noticing Agent, Effective as of the Petition Date* [D.I. 3] (the "**Stretto Claims Agent Retention Application**") and *Debtor's Application for an Order Authorizing the Employment and Retention of Stretto, Inc. as Administrative Advisor, Effective as of the Petition Date* [D.I. 94] (the "**Stretto Administrative Advisor Retention Application**"). The Bankruptcy Court entered orders approving the Stretto Claims Agent Retention Application and the Stretto Administrative Advisor Retention Application on June 5, 2024 [D.I. 31], and July 12, 2024 [D.I. 135], respectively.

Further, the Debtor filed the Debtor's Motion for Entry of an Order Authorizing the Debtor to Retain and Compensate Professionals Utilized in the Ordinary Course of Business [D.I. 95] (the "**OCP Motion**"). The Bankruptcy Court entered an order approving the OCP Motion on July 15, 2024 [D.I. 143].

The OCP Motion authorized the Debtor to retain, employ, and pay Professionals utilized by the Debtor in the ordinary course of business as of June 3, 2024, without submission of separate employment applications or further order of the Bankruptcy Court.

After conducting a review of its Executory Contracts and unexpired leases, the Debtor filed three motions to reduce unnecessary administrative burden on the Estate:

    a. The Sangamon Lease Rejection Motion to reject the Sangamon Lease, which no longer provided any benefit to the Estate. The Bankruptcy Court entered the Sangamon Lease Rejection Order on July 17, 2024 [D.I. 156].

    b. The First Rejection Motion to reject the Chelan Lease and fourteen (14) Executory Contracts that no longer provided any benefit to the Estate. The Bankruptcy Court entered the First Rejection Order on July 17, 2024 [D.I. 157].

    c. *Debtor's Second Omnibus Motion for Entry of an Order Authorizing the Rejection of Certain Executory Contracts, Effective as of the Petition Date* [D.I. 164] (the "**Second Rejection Motion**") to reject five (5) additional Executory Contracts that no longer provided any benefit to the Estate. The Bankruptcy Court entered the Second Rejection Order on August 14, 2024 [D.I. 179].

## 1.10    Projected Recovery of Avoidable Transfers

The Debtor has not yet performed an analysis of any potential recovery with respect to preference, fraudulent conveyance, or other Avoidance Actions. All claims, defenses, rights, privileges and Causes of Action, including Avoidance Actions, held by the Debtor shall vest in the Reorganized Debtor on the Effective Date. To the extent any such claims, defenses, rights, privileges, Causes of Action or Avoidance Actions are pursued, the Reorganized Debtor will make such determination in the future. Unless any Causes of Action or Avoidance Actions are expressly waived, relinquished, exculpated, released, compromised, or settled under the Plan or pursuant to a Bankruptcy Court order, the Debtor or Reorganized Debtor, as applicable, expressly reserves all Causes of Action and Avoidance Actions for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action or Avoidance Actions upon, after, or as a consequence of the Confirmation. In accordance with section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided herein, any Causes of Action or Avoidance Actions that the Debtor may hold against any Entity shall vest in the Reorganized Debtor. The Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action and Avoidance Actions. The Reorganized Debtor shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and Avoidance Actions, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to, or action, order, or approval of, the Bankruptcy Court.

## ARTICLE 2
## THE PLAN

As required by the Bankruptcy Code, the Plan places Claims and Equity Interests in various Classes and describes the treatment each Class will receive. The Plan also states whether each Class of Claims or Equity Interests is Impaired or Unimpaired. A Claim or Equity Interest can be Impaired if the Plan alters the legal, equitable, or contractual rights to which the Claimants are otherwise entitled. If the Plan is confirmed, each Creditor's recovery is limited to the amount provided in the Plan.

### 2.1   Unclassified Claims

Certain types of Claims are automatically entitled to specific treatment under the Bankruptcy Code. For example, Administrative Expenses and Priority Tax Claims are not classified. They are not considered Impaired, and Holders of such Claims do not vote on the Plan. They may, however, object if, in their view, their treatment under the Plan does not comply with that required by the Bankruptcy Code. As such, the Plan does not place the following Claims in any Class:

### A.   Administrative Expenses

The Debtor must pay all Administrative Expenses in full. If an Administrative Expense is disputed, the Bankruptcy Court must determine the validity and amount of the Administrative Expense, or in other words, "allow" the Administrative Expense. Any Administrative Expense that is undisputed and is due and owing on the Confirmation Date must be paid in accordance with this Plan, or upon such other terms as agreed upon by the Debtor and the Administrative Claimant or by Bankruptcy Court order. If the Administrative Expense is disputed, payment will be made after the Administrative Expense is allowed by the Bankruptcy Court.

There are several types of Administrative Expenses, including the following:

1.  If the Debtor trades in the ordinary course of business following its filing of the Chapter 11 Case, Creditors are entitled to be paid in full for the goods or services provided. This ordinary trade debt incurred by the Debtor after the Petition Date will be paid on an ongoing basis in accordance with the ordinary business practices and terms between the Debtor and its trade Creditors.

2.  If the Debtor received goods it has purchased in the ordinary course of business within 20 days before the Petition Date, the value of the goods received is an Administrative Expense.

3.  Administrative Expenses also include any post-petition fees and expenses allowed to Professionals, including the Allowed Claims of the Subchapter V Trustee for fees and/or reimbursements, and for attorneys and accountants employed upon Bankruptcy Court authority to render services to the Debtor during the course of the Chapter 11 Case. Creditors must receive notice of these fees and expenses, and such fees and expenses must be approved by the Bankruptcy Court, prior to payment.

The following chart lists the Debtor's estimated Administrative Expenses, and their proposed treatment under the Plan:

| Type | Estimated Amount Owed | Proposed Treatment |
|---|---|---|
| Expenses arising in the ordinary course of business after the Petition Date | Approximately $204,000.00 | Payment through the Plan as follows:<br>Paid on an ongoing basis in accordance with the customary business practices of the Debtor and terms between the Debtor and its Creditor. |
| Administrative Tax Claim | Approximately $0.00 | Payment through the Plan as follows:<br>Taxes that arise in the ordinary course of business after the Petition Date will be paid in the ordinary course and pursuant to the ordinary business practices between the Debtor and the relevant taxing authorities. |
| The value of goods received in the ordinary course of business within 20 days before the Petition Date | Approximately $0.00[3] | To the extent any such claims are filed and allowed, payment through the Plan as follows:<br>To be paid in full as soon as practicable *pro rata* on a quarterly basis and in accordance with the Debtor's Disposable Income projections. |
| Professional fees, as approved by the Bankruptcy Court | Approximately $1,886,000.00 | After Bankruptcy Court approval, payment through the Plan as follows:<br><br>Allowed Professional Fee Claims that are due and owing as of the Effective Date shall be paid in Cash by the Debtor on the Effective Date. Further, each Professional who holds a Professional Fee Claim shall be required to file with the Bankruptcy Court, and to serve on all parties required to receive notice, a final Fee Application on or before the Professional Fee Bar Date. A Professional Fee Claim with respect to which a Fee Application has been properly and timely filed pursuant to Article 2 shall be paid only to the extent Allowed by Final Order. Once all of the Professional Fee Claims have been considered and Allowed by the Bankruptcy Court, the Debtor or the Reorganized Debtor, as the case may be, shall pay, after the application of any retainer |

---

[3] As of the date of this Plan there are no filed 11 U.S.C. § 503(b)(9) claims.

| Type | Estimated Amount Owed | Proposed Treatment |
|------|----------------------|--------------------|
| | | amounts held by such Professional, such Allowed Professional Fee Claims as soon as practicable in full and in accordance with the Debtor's Disposable Income projections. |
| Subchapter V Trustee | Approximately $12,000.00 | Upon application under section 330 of the Bankruptcy Code and after Bankruptcy Court approval, payment through the Plan as follows: To be paid in full as soon as practicable and in accordance with Debtor's Disposable Income projections. |
| TOTAL | Approximately $2,102,000.00 | |

## B.    Priority Tax Claims

Priority Tax Claims are unsecured income, employment, and other taxes described by section 507(a)(8) of the Bankruptcy Code. Unless the Holder of such a section 507(a)(8) Priority Tax Claim agrees otherwise, it must receive the present value of such Claim, in regular installments paid over a period not exceeding 5 years from the order of relief.

Each Holder of a Priority Tax Claim will be paid as set forth in the chart below:

| Name of Taxing Authority and Type of Tax | Estimated Amount Owed | Date of Assessment | Treatment |
|------|------|------|------|
| Priority Tax Claims | Approximately $0.00 | Not applicable | Payment through the Plan as follows: All Allowed Priority Tax Claims, to the extent any are due as of the Effective Date, shall be paid in full upon the due date. |

## 2.2    Classes of Claims and Equity Interests

The classification of Claims against and Equity Interests in the Debtor pursuant to the Plan are as follows and are discussed in more detail below:

| Class | Description | Treatment | Impairment | Entitled to Vote |
|---|---|---|---|---|
| 1 | DIP Lenders' Secured Claim | On the Effective Date, the DIP Lenders' Secured Claim shall be allowed in the full amount outstanding under the DIP Loan Documents, including principal, interest, fees and expenses. On the Effective Date the DIP Lenders' Secured Claim will convert into the New Preferred Shares at the Original Purchase Price. | Impaired | Yes |
| 2 | Priority Unsecured Claims | Except to the extent that a Holder of a Priority Unsecured Claim agrees to a different treatment, all Allowed Priority Unsecured Claims shall be paid in full on the Effective Date. | Unimpaired | No (Presumed to Accept) |
| 3 | General Unsecured Claims | Paid in Disposable Income as defined in section 1191(d) of the Bankruptcy Code in yearly distributions on the Distribution Date over the Payment Period. | Impaired | Yes |
| 4 | Equity Interests | On the Effective Date the Holders of existing common Equity Interests will retain their common stock in the Reorganized Debtor; *provided, however*, that such common stock will be reverse split at a 1:100 ratio.<br><br>Holders of preferred Equity Interests will have their preferred Equity Interests converted, in the ratios set forth in the Debtor's certificate of incorporation as set forth in Section 2.2(D) below, into newly-issued common stock of the Reorganized Debtor (which shares of common stock in the Reorganized Debtor will be reverse split at a 1:100 ratio).<br><br>Based on the estimated valuation of the Reorganized Debtor after the New Preferred Shares Infusion, the DIP Lenders will hold approximately 73.0 - 92.5% of the New Preferred Shares.<br><br>Equity Interests will be subject to the organizational documents and any | Impaired | Yes |

| Class | Description | Treatment | Impairment | Entitled to Vote |
|---|---|---|---|---|
| | | Shareholder Agreements of the Reorganized Debtor, which will be filed as part of the Plan Supplement. | | |

The following is a more complete discussion of the Classes set forth in the Plan, and the proposed treatment that they will receive under the Plan.

**A.    Class 1: The DIP Lenders' Secured Claim**

The DIP Credit Facility is secured by substantially all of the Debtor's assets and is entitled to a first-priority priming lien. On the Effective Date, the DIP Lender's Secured Claim, currently estimated in an amount no less than $3,100,000.00, will convert into the New Preferred Shares at the Original Purchase Price. As a result of the DIP Lenders' Secured Claim and the purchase of New Preferred Shares, the DIP Lender will hold approximately 73.0 - 92.5% of the New Preferred Shares.

| Class No. | Description | Impairment | Treatment | Entitled to Vote |
|---|---|---|---|---|
| 1 | DIP Lenders' Secured Claim (estimated $3,100,000.00) | Impaired | On the Effective Date, the DIP Lenders' Secured Claim will convert into the New Preferred Shares at the Original Purchase Price. In addition, on the Effective Date, and following the conversion of the DIP Credit Facility, the DIP Lenders shall purchase Five Million Dollars ($5,000,000.00) of New Preferred Shares at the Original Purchase Price. Based on the estimate valuation of the Reorganized Debtor after the New Preferred Shares Infusion, the DIP Lenders will hold approximately 73.0 - 92.5% of the New Preferred Shares. | Yes |

Class 1 is Impaired and thus is entitled to vote to accept or reject the Plan.

B.    **Class 2: Allowed Priority Unsecured Claims**

Certain Priority Unsecured Claims that are referred to in sections 507(a)(1), (4), (5), (6), and (7) of the Bankruptcy Code are required to be placed in Classes. The Bankruptcy Code requires that each Holder of such a Claim receive Cash on the Effective Date of the Plan equal to the allowed amount of such Claim. However, a Class of Holders of such Claims may vote to accept different treatment.

The following chart identifies the Plan's proposed treatment of Allowed Priority Unsecured Claims under section 507(a)(4) of the Bankruptcy Code:

| Class No. | Description | Impairment | Treatment | Entitled to Vote |
|---|---|---|---|---|
| 2 | Allowed Priority Unsecured Claims (11 U.S.C. § 507(a)(4)) Total Amount of Claims = $30,300.00 | Unimpaired | Except to the extent that a Holder of a Priority Unsecured Claim agrees to a different treatment, all Allowed Priority Unsecured Claims shall be paid in full on the Effective Date. | No |

Class 2 is Unimpaired and conclusively deemed to have accepted the Plan under Bankruptcy Code section 1126(f). Holders of Class 2 Allowed Priority Unsecured Claims are thus not entitled to vote to accept or reject the Plan.

C.    **Class 3: General Unsecured Claims**

General Unsecured Claims are not secured by property of the Estate and are not entitled to priority under section 507(a) of the Bankruptcy Code. The Debtor projects that the Holders of General Unsecured Claims will be paid in full over the Payment Period, but that result is not guaranteed—therefore, the range of recovery for Holders of General Unsecured Claims ranges from 0 – 100%.

The following chart identifies the Plan's proposed treatment of General Unsecured Claims against the Debtor:

| Class No. | Description | Impairment | Treatment | Entitled to Vote |
|---|---|---|---|---|
| 3 | General Unsecured Claims Total amount of Claims asserted as of the date hereof: | Impaired | Paid in Disposable Income as defined in section 1191(d) of the Bankruptcy Code in yearly distributions on the Distribution Date over the Payment Period, *provided, however* that in the event the Reorganized Debtor is liquidated or dissolved prior to the | Yes |

| | Approximately $5,600,000.00 | | conclusion of the Payment Period, the Reorganized Debtor shall pay the balance owed to the Holders of Allowed Unsecured Claims prior to making any Distributions to the Holders of Equity Interests in the Reorganized Debtor. The Debtor may elect in its sole discretion to pay the balance owed to Allowed Unsecured Claims without penalty or premium prior to the conclusion of the Payment Period. | |

Class 3 is Impaired and thus is entitled to vote to accept or reject the Plan.

**D.    Class 4: Equity Interest Holders**

Equity Interest Holders are parties who hold an ownership interest (*i.e.*, equity interest) in the Debtor.  In a corporation, entities or individuals holding preferred or common stock are Equity Interest Holders.

The following chart sets forth the Plan's proposed treatment of the Class of Equity Interest Holders:

| Class No. | Description | Impairment | Treatment | Entitled to Vote |
|---|---|---|---|---|
| 4 | Equity Interests | Impaired | On the Effective Date the Holders of existing common Equity Interests will retain their common stock in the Reorganized Debtor; *provided, however*, that such common stock will be reverse split at a 1:100 ratio.<br><br>Holders of existing preferred Equity Interests will have their preferred Equity Interests converted, in the ratios set forth in the Debtor's certificate of incorporation as set forth in Section 2.2(D) below, into newly-issued common stock of the Reorganized Debtor (which shares of common stock in the Reorganized Debtor will be reverse split at a 1:100 ratio).<br><br>Conversion Ratios for existing preferred stock to Common Stock: | Yes |

16

| Class No. | Description | Impairment | Treatment | | | Entitled to Vote |
|---|---|---|---|---|---|---|
| | | | Class | Ratio Today (Preferred to Common) | After 1:100 Reverse Split | |
| | | | Seed | 1 | 0.01 | |
| | | | Series A | 1 | 0.01 | |
| | | | Series B | 1.0618 | 0.010618 | |
| | | | Series C | 1.1918 | 0.011918 | |
| | | | Series C-1 | 1.1918 | 0.011918 | |
| | | | Series D | 1 | 0.01 | |

By way of illustration, each holder of Series C Preferred Stock shall receive 0.011918 shares of Common Stock in exchange for each share of Series C Preferred Stock held.

All existing warrants, options, and restricted stock units of the Debtor shall be extinguished.

In addition, on the Effective Date, and following the conversion of the DIP Credit Facility to the New Preferred Shares and the DIP Lenders purchase of Five Million Dollars ($5,000,000.00) of the New Preferred Shares at the Original Purchase Price, Existing Investors shall be entitled to purchase, on a *pro rata* basis, up to Two Million Dollars ($2,000,000.00) of the New Preferred Shares at the Original Purchase Price.

Equity Interests will be subject to the organizational documents and any Shareholder Agreements of the Reorganized Debtor, which will be filed as part of the Plan Supplement.

Class 4 is Impaired and thus is entitled to vote to accept or reject the Plan.

17

**2.3**     **Estimated Number and Amount of Claims Objections**

The Debtor may object to the amount or validity of any Claim within 60 days of the Confirmation Date, the Claims Objection Deadline, by filing an objection with the Bankruptcy Court and serving a copy of the objection on the Holder of the Claim. The Claim objected to will be treated as a Disputed Claim under the Plan. If and when a Disputed Claim is finally resolved by the allowance of the Claim in whole or in part, the Debtor will pay the Allowed Claim in accordance with the Plan.

**2.4**     **Treatment of Executory Contracts and Unexpired Leases**

Executory Contracts are contracts where significant performance of the contract remains for the debtor and another party to the contract. The Debtor has the right to reject, assume (*i.e.*, accept), or assume and assign these types of contracts to another party, subject to the Bankruptcy Court's approval. The paragraphs below explain the Debtor's intentions regarding its Executory Contracts (which includes an unexpired lease) and the impact such intentions would have on the other parties to the contracts.

**A.**     **Assumption of Executory Contracts and Unexpired Lease**

The Executory Contracts and unexpired lease shown on **Exhibit C** have been or will be assumed by the Debtor. Assumption means that the Debtor has elected to continue to perform the obligations under such contract, and to Cure defaults of the type that must be Cured under the Bankruptcy Code, if any. **Exhibit C** also lists how the Debtor will Cure and compensate the counterparty to such contract for any such defaults.

If you object to the assumption of your Executory Contract, the proposed Cure of any defaults, or the adequacy of assurance of future performance, you must file and serve your objection to the assumption within the deadline for objecting to the Confirmation of the Plan, unless the Bankruptcy Court has set an earlier time.

**B.**     **Rejection of Executory Contracts and Unexpired Leases**

The Executory Contracts shown on **Exhibit D** have been or will be rejected by the Debtor.

Further, the Debtor will be conclusively deemed to have rejected all Executory Contracts and/or unexpired leases not expressly shown on **Exhibit C** or **Exhibit D**, or not otherwise assumed pursuant to an order of the Bankruptcy Court before the date of the order confirming the Plan.

Rejection means that the Debtor has elected not to continue to perform the obligations under such contracts or leases. If the Debtor has elected to reject a contract or lease, the counterparty to the contract or lease will be treated as an Unsecured Creditor holding a Claim that arose before the bankruptcy was filed.

**The deadline for filing a Proof of Claim based on a Rejection Claim arising from the rejection of an Executory Contract that is rejected by the Debtor is 30 days after the entry of the Confirmation Order**. Any Claim based on the rejection of an Executory Contract will be barred if the proof of claim is not timely filed unless the Bankruptcy Court orders otherwise.

18

**ARTICLE 3**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

**3.1      Reorganization of the Debtor as the Reorganized Debtor**

Before, on, and after the Effective Date, the Debtor or the Reorganized Debtor, as applicable, shall take all actions as may be necessary or appropriate to effectuate the restructuring transactions contemplated under the Plan, including: (a) the execution and delivery of any appropriate agreements or other documents of incorporation, merger, consolidation, restructuring, conversion, disposition, transfer, or dissolution containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (c) the filing of appropriate certificates of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (d) such other transactions that are required to effectuate the restructuring transactions; (e) all transactions necessary to provide for the transfer and vesting of substantially all of the assets of the Debtor into the Reorganized Debtor; and (f) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

**3.2      Cancellation of Notes, Instruments, Certificates, and Other Documents**

On the Effective Date, except as otherwise specifically provided for in the Plan: (a) the obligations of any Debtor under any certificate, share, note, bond, indenture, purchase right, or other instrument or document, directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest, equity, or portfolio interest in the Debtor or any warrants, options, or other securities exercisable or exchangeable for, or convertible into, debt, equity, ownership, or profits interests in the Debtor giving rise to any Claim or Interest shall be canceled and deemed surrendered as to the Debtor and shall not have any continuing obligations thereunder; and (b) the obligations of the Debtor pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificates of incorporation or similar documents governing the shares, certificates, notes, bonds, indenture, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtor shall be fully released, settled, and compromised.

**3.3      Exemption from Certain Taxes and Fees**

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant this Plan, or the issuance, transfer or exchange of any security under the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sale or use tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other

documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment.

## 3.4    Sources of Consideration for Plan Distributions

The Plan will be funded by Cash on hand on the Effective Date and the projected Disposable Income earned from the operations of the Reorganized Debtor following the New Preferred Shares Infusion. For the avoidance of doubt, the New Preferred Shares Infusion is not a source of consideration for distributions to be made pursuant to this Plan either as Cash on hand or Disposable Income.

## 3.5    Reorganized Debtor

On and after the Effective Date, the Reorganized Debtor shall succeed to all rights, claims, Causes of Action, privileges, defenses of the Debtor and (a) file appropriate certificates of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law, (b) resolve Disputed Claims, (c) make distributions on account of Allowed Claims, (d) establish and fund any distribution reserve accounts, (e) enforce and prosecute claims, interests, rights, and privileges under the Causes of Action on the Retained Causes of Action List in an efficacious manner and only to the extent the benefits of such enforcement or prosecution are reasonably believed to outweigh the costs associated therewith, (f) file appropriate tax returns, and (g) administer the Plan in an efficacious manner. The Reorganized Debtor shall be deemed to be substituted as the party-in-lieu of the Debtor in all matters, including (x) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court and (y) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Reorganized Debtor to file motions or substitutions of parties or counsel in each such matter.

## 3.6    Dissolution of Existing Board of Directors and Establishment of New Board of Directors

On the Effective Date, the authority, power, and incumbency of the persons acting as directors or officers of the Debtor shall be deemed to have resigned, solely in their capacities as such, and the new directors and officers of the Reorganized Debtor shall be appointed. From and after the Effective Date, the new board of directors of the Reorganized Debtor (the "**New Board**") shall be appointed by the Reorganized Debtor and such board of directors shall be responsible for the management of the business and affairs of the Reorganized Debtor in accordance with all applicable certificates of incorporation, by-laws, corporate governance documents and applicable state law. The foregoing shall not limit the authority of the Reorganized Debtor, as applicable, to continue the employment any former manager, officer or employee of the Debtor.

The New Board shall consist of five members comprised of (i) two representatives designated by Ailment Capital, LLC; (ii) one representative designated by S2G Builders Food & Agriculture Fund III, LP; (iii) the person then serving as the Chief Executive Officer of the Reorganized Debtor; and (iv) one independent director elected by a majority of the outstanding capital stock, voting together as a single class on as-converted to common basis and designated as agreed upon by the stockholders pursuant to the Shareholder Agreements, which will be amended

and filed as part of the Plan Supplement. Each member of the Board of Directors shall serve in accordance with applicable non-bankruptcy law and the Debtor's certificate or certificates of incorporation and bylaws (which shall be amended to prohibit the issuance of non-voting shares), as each of the same may be amended from time to time.

**3.7**    **Release of Liens**

Except as otherwise expressly provided herein, upon the closing of the Chapter 11 Case, all Liens on any property of any Debtor shall automatically terminate, all property subject to such Liens shall be automatically released, and all guarantees of any Debtor shall be automatically discharged and released. For the avoidance of doubt, the Liens secured the DIP Claims shall not be released until the DIP Claims have been converted to New Preferred Shares as set forth in Section 2.2 of this Plan.

**3.8**    **Corporate Action**

Upon the Effective Date, all actions contemplated under the Plan, regardless of whether taken before, on, or after the Effective Date, shall be deemed authorized and approved in all respects. All matters provided for in the Plan or deemed necessary or desirable by the Debtor before, on, or after the Effective Date involving the corporate structure of the Debtor or the Reorganized Debtor, and any corporate action required by the Debtor or the Reorganized Debtor in connection with the Plan or corporate structure of the Debtor or Reorganized Debtor, shall be deemed to have occurred and shall be in effect on the Effective Date, without any requirement of further action by the security holders, directors, managers, or officers of the Debtor or the Reorganized Debtor. Before, on, or after the Effective Date, the appropriate officers of the Debtor or the Reorganized Debtor, as applicable, shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtor. The authorizations and approvals contemplated by this Article shall be effective notwithstanding any requirements under non-bankruptcy law.

**3.9**    **Effectuating Documents; Further Transactions**

Prior to the Effective Date, the Debtor is, and on and after the Effective Date, the Reorganized Debtor, and the officers and members thereof are, authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, without the need for any approvals, authorizations, notice, or consents, except for those expressly required pursuant to the Plan.

**3.10**    **Closing the Chapter 11 Case**

When all Disputed Claims have become Allowed or Disallowed, the Reorganized Debtor shall seek authority from the Bankruptcy Court to close the Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules. The Chapter 11 Case shall close upon Bankruptcy Court approval.

**3.11    Corporate Existence**

Except as otherwise provided in the Plan, the new organizational documents, the new Shareholders' Agreement, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, the Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to applicable law in the jurisdiction in which the Debtor is incorporated, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval.

**3.12    Vesting of Assets in the Reorganized Debtor**

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, upon the Effective Date, all property of the Debtor and the Estate, including but not limited to all Causes of Action, the Debtor's ownership interests in the non-debtor domestic and foreign entities identified on **Exhibit A,** and any property acquired by the Debtor after the Petition Date, shall vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Debtor may operate its business and may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

**3.13    New Organizational Documents**

On the Effective Date, each of the Reorganized Debtor will file its new organizational documents with the secretary of state, or other applicable legal agency or representative responsible for incorporating or forming a legal entity, in accordance with the applicable laws of the respective state of incorporation or formation. The new organizational documents shall be consistent with section 1123(a)(6) of the Bankruptcy Code. Pursuant to section 1123(a)(6) of the Bankruptcy Code, the new organizational documents will prohibit the issuance of non-voting equity securities. After the Effective Date, the Reorganized Debtor may amend and restate its organizational documents and other constituent documents as permitted by the laws of the respective state of incorporation or formation.

**3.14    Effectuating Documents; Further Transactions**

On and after the Effective Date, the Reorganized Debtor, its officers, and the members of the New Board are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan, including the New Preferred Shares, in the name of and on behalf of the Reorganized Debtor, without the need for any approvals, authorization, or consents.

**3.15    Preservation of Causes of Action**

Unless any Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtor shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action (including all Avoidance Actions), whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtor may pursue such Causes of Action, as appropriate, in the Reorganized Debtor's sole discretion. No Entity may rely on the absence of a specific reference in the Plan or the Plan Supplement to any Cause of Action against it as any indication that the Debtor or the Reorganized Debtor will not pursue any and all available Causes of Action against it. The Debtor or the Reorganized Debtor, as applicable, expressly reserves all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled under the Plan or pursuant to a Bankruptcy Court order, the Debtor or Reorganized Debtor, as applicable, expressly reserves all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. In accordance with section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided herein, any Causes of Action that the Debtor may hold against any Entity shall vest in the Reorganized Debtor. The Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtor shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to, or action, order, or approval of, the Bankruptcy Court.

**3.16    Reporting Upon Emergence**

On the Effective Date, none of the New Preferred Shares or new common shares will be registered under the Securities Act or the Securities Exchange Act or listed on a national securities exchange, the Reorganized Debtor will not be a reporting company under the Securities Exchange Act, the Reorganized Debtor shall not be required to and will not file Securities Exchange Act reports with the Securities and Exchange Commission or any other entity or party, and the Reorganized Debtor shall not be required to file monthly operating reports with the Bankruptcy Court after the Effective Date. In order to prevent the Reorganized Debtor from becoming subject to the reporting requirements of the Securities Exchange Act, except in connection with a public offering, a separate agreement or the Reorganized Debtor's organizational documents may impose certain trading restrictions, and the Reorganized Debtor's Interests may be subject to certain transfer and other restrictions designed to maintain the Reorganized Debtor as a private, non-reporting company.

**3.17    Issuance of the New Preferred Shares and Terms Applicable to New Preferred Shares**

The New Preferred Shares will be issued by the Reorganized Debtor on the Effective Date at the Original Purchase Price on the terms set forth herein.

**3.18    Preferred Dividend**

The New Preferred Shares will carry an annual 12% cumulative dividend whether or not declared by the Board of Directors, compounded on an annual basis (the "Preferred Dividend"), and shall be payable upon a liquidation (subject to the limitations described in the section below entitled "Liquidation Preference"); provided that such Preferred Dividend shall be reduced, dollar for dollar, by any earlier dividend declared and paid by the Board of Directors. No dividends shall be payable on account of the New Preferred Shares so long as any Allowed Unsecured Claims remain unpaid pursuant to this Plan; provided, that for the avoidance of doubt, the Preferred Dividend shall continue to accrue in accordance with the terms set forth herein notwithstanding that any Allowed Unsecured Claims may remain unpaid.

**3.19    Liquidation Preference**

In the event of any Deemed Liquidation Event, the proceeds available for distribution to the Reorganized Debtor's equityholders (and after payment of the Reorganized Debtor's debts, including all Allowed Unsecured Claims in accordance with the terms of the Plan) shall be paid as follows: *First*, to pay the Original Purchase Price plus the Preferred Dividend on each share of New Preferred Shares; and *Second*, the balance of any proceeds shall be distributed to the holders of common stock and the New Preferred Shares, pro rata based upon the number of shares held.

So long as any shares of New Preferred Shares are outstanding, in addition to any other vote or approval required under law, the New Preferred Shares will have protective provisions consistent with the provisions in the Reorganized Debtor's existing certificate of incorporation and Investor Rights Agreement. The annual budget shall be approved by the Board of Directors, including at least one Aliment Director ("Preferred Director Approval").

**3.20    Future Equity Raises.**

All holders of the New Preferred Shares to be issued and outstanding pursuant to this Plan shall have a *pro rata* right to participate in subsequent issuances of equity securities of the Reorganized Debtor based on their *pro rata* share in the New Preferred Shares. To the extent any such holder chooses not to participate in its *pro rata* share of any future equity raises, the remaining equity interests of the Reorganized Debtor shall have the right to purchase the remaining *pro rata* shares until such shares are fully subscribed and purchased.

**3.21    Right of First Refusal/Right of Co-Sale**

The Reorganized Debtor, first, and then the holder of New Preferred Shares, second, will have a right of first refusal with respect to any shares of capital stock of the Reorganized Debtor to be transferred by persons holding greater than 1% of the Reorganized Debtor's common stock, with a right of oversubscription for investors of shares unsubscribed by the other investors. Before any such person may sell common stock, he/she will give the investors an opportunity to participate

in such sale on a basis proportionate to the amount of securities held by the seller and those held by the participating investors.

      **A.**    **Optional Conversion.** The New Preferred Shares initially convert l:l to common stock at any time at option of each holder, subject to adjustments for stock dividends, splits, combinations and similar events and as described below under "Anti-Dilution Provisions."

      **B.**    **Anti-Dilution Provisions.** The conversion price of the New Preferred Shares will have broad-based weighted average ratchet anti-dilution protection in the event the Reorganized Debtor issues additional equity securities at a purchase price less than the then-effective conversion price for the New Preferred Shares (other than the excepted issuances set forth below). The New Preferred Shares conversion price will also be subject to proportional adjustments for stock splits, stock dividends, recapitalizations, combinations and the like. Certain customary issuances as set forth in the certificate of incorporation (and updated to incorporate the financing transaction contemplated herein) shall not trigger anti-dilution adjustments.

      **C.**    **Drag Along.** Holders of New Preferred Shares and all future holders of greater than 1% of common stock shall be required to enter into an agreement with the Reorganized Debtor and the holders of New Preferred Shares that provides that such stockholders will vote their shares in favor of a deemed liquidation event or transaction in which 50% or more of the voting power of the Reorganized Debtor is transferred and which is approved by the Board of Directors (with the Preferred Director Approval) and the holders of 50% of the outstanding shares of the New Preferred Shares, on an as-converted basis.

## 3.22    <u>Payments</u>

If the Plan is confirmed under section 1191(a) of the Bankruptcy Code, the Reorganized Debtor shall make all Plan payments to Creditors under the Plan.

If the Plan is confirmed under section 1191(b) of the Bankruptcy Code, the Subchapter V Trustee has consented to the Debtor making the payments to Creditors provided for in the Plan.

## 3.23    <u>Post-Confirmation Management</u>

Parker Booth shall remain the Reorganized Debtor's President and CEO after the Effective Date. Daniel Berger shall remain the Reorganized Debtor's General Counsel, Secretary, & Vice President, Corporate Development.

## 3.24    <u>Tax Consequences of the Plan</u>

***Creditors and Equity Interest Holders Concerned with How the Plan May Affect Their Tax Liability Should Consult with Their Own Accountants, Attorneys, and/or Advisors.***

## 3.25    <u>Projections in Support of Debtor's Ability to Make Payments Under the Proposed Plan</u>

The Debtor has provided projected financial information. Those projections are listed in **<u>Exhibit E</u>**.

## ARTICLE 4
## FEASIBILITY OF PLAN

The Bankruptcy Court must find that Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor, unless such liquidation or reorganization is proposed in the Plan.

**4.1**     **Ability to Initially Fund Plan**

As set forth herein and in **Exhibit E**, the Debtor believes that the Debtor will have enough Cash on hand on the Effective Date of the Plan to pay all the Claims and expenses that are entitled to be paid on that date.

**4.2**     **Ability to Make Future Plan Payments and Operate Without Further Reorganization**

The Debtor anticipates that its Plan will be confirmed pursuant to 28 U.S.C. §1191(a) and that the services of the Subchapter V Trustee will terminate on the Effective Date of the Plan. In the event that the Plan is confirmed pursuant to 28 U.S.C. § 1191(b), the Debtor will submit all or such portion of the future earnings or other future income of the Debtor to the supervision and control of the Subchapter V Trustee as is necessary for the execution of the Plan, unless the Subchapter V Trustee agrees otherwise.

The Debtor has provided projected financial information through Q4 2028. Those projections, listed on **Exhibit E**, show that the Debtor anticipates having cash flow after paying operating expenses and post-confirmation taxes sufficient to meet its obligations under the Plan. All Disposable Income over a five-year period (unless Allowed Claims are paid in full earlier) will be devoted to paying Allowed Claims under the Plan. While the Debtor projects that the Holders of General Unsecured Claims will be paid in full over the Payment Period, that result is not guaranteed—therefore, the range of recovery for Holders of General Unsecured Claims ranges from 0 – 100%.

**You Should Consult with Your Accountant or Other Financial Advisor if You Have Any Questions Pertaining to These Projections.**

## ARTICLE 5
## LIQUIDATION ANALYSIS

To confirm the Plan, the Bankruptcy Court must find that all Creditors and Equity Interest Holders who do not accept the Plan will receive at least as much under the Plan as such Claimants and Equity Interest Holders would receive in a chapter 7 liquidation. A liquidation analysis is attached hereto as **Exhibit F**. As set forth in the liquidation analysis, the Debtor estimates that Holders of General Unsecured Claims and Equity Interests would receive no Distributions in the event of a chapter 7 liquidation.

## ARTICLE 6
## DISCHARGE

**If the Plan is confirmed under section 1191(a) of the Bankruptcy Code,** on the Confirmation Date of this Plan, the Debtor will be discharged from any debt that arose before Confirmation of this Plan, subject to the occurrence of the Effective Date, to the extent specified in section 1141(d) of the Bankruptcy Code; or

**If the Plan is confirmed under section 1191(b) of the Bankruptcy Code,** as soon as practicable after completion by the Debtor of all payments due under the Plan, unless the Bankruptcy Court approves a written waiver of discharge executed by the Debtor after the order for relief under this chapter, the Bankruptcy Court shall grant the Debtor a discharge of all debts provided in section 1141(d)(1)(A) of this title, and all other debts allowed under section 503 of this title and provided for in this Plan.

## ARTICLE 7
## GENERAL PROVISIONS

### 7.1    Binding Effect

If the Plan is confirmed, the provisions of the Plan will bind the Debtor and all Creditors, whether or not they accept the Plan. The rights and obligations of any entity named or referred to in this Plan will be binding upon, and will inure to the benefit of the successors or assigns of such entity.

### 7.2    Severability

If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

### 7.3    Retention of Jurisdiction by the Bankruptcy Court

The Bankruptcy Court shall retain jurisdiction of this case with regard to the following matters: (i) to make such orders as are necessary or appropriate to implement the provisions of this Plan and to resolve any disputes arising from implementation of the Plan; (ii) to rule on any modification of the Plan proposed under section 1193 of the Bankruptcy Code; (iii) to hear and allow all applications for compensation to Professionals and other Administrative Expenses; (iv) to resolve all issues regarding Claims objections, and issues arising from the assumption/rejection of Executory Contracts or unexpired leases, and (v) to adjudicate any cause of action which may exist in favor of the Debtor, including preference and fraudulent transfer causes of action.

### 7.4    Captions

The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

**7.5    Modification of Plan**

The Debtor may modify the Plan at any time before Confirmation of the Plan pursuant to section 1193(a) of the Bankruptcy Code. However, the Bankruptcy Court may require additional items including revoting on the Plan.

If the Plan is confirmed under section 1191(a) of the Bankruptcy Code, the Debtor may also seek to modify the Plan at any time after Confirmation only if (1) the Plan has not been substantially consummated *and* (2) the Bankruptcy Court authorizes the proposed modifications after notice and a hearing.

If the Plan is confirmed under section 1191(b) of the Bankruptcy Code, the Debtor may seek to modify the Plan at any time only if (1) it is within 3 years of the Confirmation Date, or such longer time not to exceed 5 years, as fixed by the Bankruptcy Court *and* (2) the Bankruptcy Court authorizes the proposed modifications after notice and a hearing.

**7.6    Final Decree**

Once the Estate has been fully administered, as provided in Rule 3022 of the Federal Rules of Bankruptcy Procedure, the Debtor, or such other party as the Bankruptcy Court shall designate in the Plan Confirmation Order, shall file a motion with the Bankruptcy Court to obtain a final decree to close the case. Alternatively, the Bankruptcy Court may enter such a final decree on its own motion.

**7.7    Exculpation**

None of the Exculpated Parties shall have or incur any liability to any Holder of a Claim or Equity Interest, or other party in interest, or any of their respective members, officers, directors, employees, advisors, professionals, attorneys or agents or any of their successors and assigns, with respect to any Exculpated Claim, including, without limitation, any act or omission in connection with, related to, or arising out of, in whole or in part, the Debtor's Chapter 11 Case, except for willful misconduct, gross negligence, fraud or criminal misconduct as determined by a Final Order of a court of competent jurisdiction, and, in all respects, the Exculpated Parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under this Plan.

**7.8    Injunction**

**Except with respect to the obligations arising under the Plan or the Confirmation Order, and except as otherwise expressly provided in the Plan or the Confirmation Order, including Article 6 of the Plan, all Entities that held, hold, or may hold claims or interests that have been discharged or exculpated pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtor or Reorganized Debtor, or the other Exculpated Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such**

**claims or interests; (3) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property of such Entities on account of or in connection with or with respect to any such claims or interests; (4) asserting any right of setoff or subrogation on account of or in connection with or with respect to any such claims or interests unless such Entity has timely asserted such setoff right in a document filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests discharged or exculpated pursuant to the Plan.**

**ARTICLE 8**
**ATTACHMENTS**

The following documents accompany the Plan:

- <u>Exhibit A</u>: Corporate Organizational Structure
- <u>Exhibit B</u>: Monthly Operating Report
- <u>Exhibit C</u>: Assumed Executory Contracts and Unexpired Lease
- <u>Exhibit D</u>: Rejected Executory Contracts and Unexpired Leases
- <u>Exhibit E</u>: Financial Projections
- <u>Exhibit F</u>: Liquidation Analysis

The following documents will be provided in the Plan Supplement:

- Identity of New Board members
- Identity of management of Reorganized Debtor
- Proposed Certificate of Incorporation and By-Laws of the Reorganized Debtor
- Proposed Shareholder Agreements of the Reorganized Debtor
- Any and all additional documents or exhibits necessary to the Debtor's proposed confirmation of the Plan

**ARTICLE 9**
**FREQUENTLY ASKED QUESTIONS**

**What Is the Debtor Attempting to Do in Chapter 11?** Chapter 11 is the principal reorganization chapter of the Bankruptcy Code. Under Chapter 11, a debtor attempts to restructure the Claims held against it. Formulation and Confirmation of a Plan of reorganization is the primary goal of Chapter 11. When reorganization is not feasible, however, a debtor may propose a liquidating Plan under Chapter 11. The Plan is the legal document which sets forth the manner and the means by which Holders of Claims against a debtor will be treated.

**Why Am I Receiving This Plan?** In order to confirm a Plan of reorganization, the Bankruptcy Code requires that a debtor solicit acceptances of a proposed plan, which it is doing with this Plan. If the Creditors are satisfied with the information provided in the Plan and the terms of the Plan as proposed, and have voted for the Plan and returned the requisite number of ballots to counsel for the Debtor, the Bankruptcy Court may confirm the Plan as proposed by the Debtor.

**How Do I Determine Which Class I Am In?** To determine the Class of your Claim or interest, you must first determine whether your Claim is secured or unsecured. Your Claim is secured if you have a validly perfected security interest in collateral owned by the Debtor. If you do not have any collateral, your Claim is unsecured. The Table of Contents will direct you to the treatment provided to the Class in which you are grouped. The pertinent section of the Plan dealing with that Class will explain, among other things, who is in that Class, what is the size of the Class, what you will receive if the Plan is confirmed, and when you will receive what the Plan has provided for you if the Plan is confirmed. Article 2 lists all Classes of Claimants and their types of Claims.

**Why Is Confirmation of a Plan of Reorganization Important?** Confirmation of the Plan is necessary because if the Plan is confirmed, the Debtor and all of its Creditors are bound by the terms of the Plan. If the Plan is not confirmed, the Debtor may not pay Creditors as proposed in the Plan while the Debtor remains in bankruptcy.

**What Is Necessary to Confirm a Plan of Reorganization?** Confirmation of the Plan requires, among other things, the vote in favor of the Plan of two-thirds in total dollar amount and a majority in number of Claims actually voting in each voting Class. If the vote is insufficient, the Bankruptcy Court can still confirm the Plan, but only if certain additional elements are shown including that the Plan does not discriminate unfairly, and is fair and equitable, with respect to each Class of Claims or interests that is impaired under, and has not accepted, the Plan.

**Am I Entitled to Vote on the Plan?** Any Creditor of the Debtor whose Claim is impaired under the Plan is entitled to vote, if either (i) the Creditor's Claim has been scheduled by the Debtor and such Claim is not scheduled as disputed, contingent, or unliquidated, or (ii) the Creditor has filed a proof of Claim on or before the last date set by the Bankruptcy Court for such filings. Any Claim to which an objection has been filed (and such objection is still pending) is not entitled to vote, unless the Bankruptcy Court temporarily allows the Creditor to vote upon the Creditor's motion. Such motion must be heard and determined by the Bankruptcy Court prior to the date established by the Bankruptcy Court to confirm the Plan.

**How Do I Determine Whether I Am in an Impaired Class?** Article 2, Section 2.2 of the Plan identifies the Classes of Creditors whose Claims are impaired. If your Claim is impaired, your vote will be considered by the Bankruptcy Court.

**When Is the Deadline by Which I Need to Return My Ballot?** The Plan is being distributed to all Claim Holders for their review, consideration and approval. The deadline by which ballots must be returned is September 23, 2024, at 4:00 p.m. (ET). Ballots must be mailed to Hazel Technologies, Inc., c/o Stretto, 410 Exchange, Suite 100, Irvine, California, 92602 or submitted online via https://balloting.stretto.com.

**How Do I Determine When and How Much I Will Be Paid?** In Article 2, the Debtor has provided both written and financial summaries of what it anticipates each Class of Creditors will receive under the Plan.

## ARTICLE 10
## DEFINITIONS

For purposes of this Plan, unless the context otherwise requires, all capitalized terms not otherwise defined shall have the meanings ascribed to them in Article 9 of this Plan. The definitions and rules of construction set forth in sections 101 and 102 of the Bankruptcy Code shall apply when terms defined or construed in the Bankruptcy Code are used in this Plan. The definitions that follow that are found in the Bankruptcy Code are for convenience of reference only, and are superseded by the definitions found in the Bankruptcy Code.

10.1    **Administrative Claim or Administrative Expense**: Any cost or expense of administration of the Chapter 11 Case entitled to priority under section 507(a)(2) of the Bankruptcy Code and allowed under section 503(b) of the Bankruptcy Code, including without limitation, any actual and necessary expenses of preserving the Estate, any actual and necessary expenses incurred following the filing of the bankruptcy petition by the Debtor in Possession, allowances of compensation or reimbursement of expenses to the extent allowed by the Bankruptcy Court under the Bankruptcy Code, the Allowed Claim of the Subchapter V Trustee for fees and/or reimbursements, and any fees or charges assessed against the Estate under Chapter 11, Title 28, United States Code.

10.2    **Administrative Claimant**: Any person entitled to payment of an Administrative Claim or Administrative Expense.

10.3    **Administrative Tax Claim**: Any tax incurred pursuant to section 503(b)(1)(B) of the Bankruptcy Code.

10.4    **Allowed Unsecured Claim**: Any Claim against the Debtor pursuant to section 502 of the Bankruptcy Code to the extent that (a) a Proof of Claim was either timely filed or was filed late with leave of the Bankruptcy Court or without objection by the Debtor, and (b) as to which either (i) a party in interest, including the Debtor, does not timely file an objection, or (ii) is allowed by a Final Order.

10.5    **Avoidance Actions**: Causes of Action under sections 502(d), 542, 544, 545, 547, 548, 549, 550, and 553 of the Bankruptcy Code and any other avoidance actions under the Bankruptcy Code.

10.6    **Bankruptcy Code**: The Bankruptcy Reform Act of 1978, as amended and codified as Title 11, United States Code.

10.7    **Bankruptcy Court**: The United States Bankruptcy Court for the District of Delaware.

10.8    **Cash**: Cash, cash equivalents, and other readily marketable securities or instruments issued by a person other than the Debtor, including, without limitation, readily marketable direct obligations of the United States of America, certificates of deposit issued by banks and commercial paper of any entity, including interest accrued or earned thereon.

10.9    **Causes of Action**: Any and all actions, causes of action, rights, suits, debts, sums of money, damages, judgments, claims, and demands whatsoever, whether known or unknown,

existing or hereafter arising, in law, equity, or otherwise, including but not limited to the Avoidance Actions, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Case, including through the Effective Date, that belong to the Detor, the Debtor in Possession, or the Estate.

10.10    **Chapter 11 Case or Case**: This case under subchapter V of chapter 11 of the Bankruptcy Code in which Hazel Technologies, Inc. is the Debtor in Possession.

10.11    **Claim**: Any "right to payment from the Debtor whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or any right to an equitable remedy for future performance if such breach gives rise to a right of payment from the Debtor, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, disputed, undisputed, secured or unsecured." 11 U.S.C. § 101(5).

10.12    **Claimant**: Any person entitled to payment of a Claim.

10.13    **Claims Objection Deadline**: As defined in section 2.3 of the Plan.

10.14    **Class**: A category of Holders of Claims or interests which are substantially similar to the other Claims or interests in such Class.

10.15    **Confirmation**: The entry by the Bankruptcy Court of an order confirming this Plan.

10.16    **Confirmation Date**: The Date upon which the Bankruptcy Court shall enter the Confirmation Order; provided however, that if on motion the Confirmation Order or consummation of the Plan is stayed pending appeal, then the Confirmation Date shall be the entry of the Final Order vacating such stay or the date on which such stay expires and is no longer in effect.

10.17    **Confirmation Order**: An order of the Bankruptcy Court or any amendment thereto confirming the Plan in accordance with the provisions of chapter 11 of the Bankruptcy Code.

10.18    **Creditor**: Any person who has a Claim against the Debtor that arose on or before the Petition Date.

10.19    **Cure**: The payment or other honoring of all obligations required to be paid or honored in connection with the assumption of an Executory Contract pursuant to section 365 of the Bankruptcy Code, including (a) the cure of any non-monetary defaults to the extent required, if at all, pursuant to section 365 of the Bankruptcy Code, and (b) with respect to monetary defaults, the distribution, within a reasonable period of time following the Effective Date, of Cash, or such other property as may be agreed upon by the parties or ordered by the Bankruptcy Court, with respect to the assumption (or assumption and assignment) of an Executory Contract, pursuant to section 365(b) of the Bankruptcy Code, in an amount equal to all unpaid monetary obligations or such other amount as may be agreed upon by the parties, under such Executory Contract, to the extent such obligations are enforceable under the Bankruptcy Code and applicable non-bankruptcy law.

10.20 **Debtor and Debtor in Possession**: Hazel Technologies, Inc., the debtor in possession in this Chapter 11 Case.

10.21 **Deemed Liquidation Event**: As defined in the Debtor's existing current certificate of incorporation: (a) a merger or consolidation in which (i) Hazel is a constituent party or (ii) a subsidiary of Hazel is a constituent party and Hazel issues shares of its capital stock pursuant to such merger or consolidation, except any such merger or consolidation involving Hazel or a subsidiary in which the shares of capital stock of Hazel outstanding immediately prior to such merger or consolidation continue to represent, or are converted into or exchanged for shares of capital stock that represent, immediately following such merger or consolidation, a majority, by voting power, of the capital stock of (1) the surviving or resulting corporation; or (2) if the surviving or resulting corporation is a wholly owned subsidiary of another corporation immediately following such merger or consolidation, the parent corporation of such surviving or resulting corporation; or (b) the sale, lease, transfer, exclusive license or other disposition, in a single transaction or series of related transactions, by Hazel or any subsidiary of Hazel of all or substantially all the assets of Hazel and its subsidiaries taken as a whole, or the sale or disposition (whether by merger, consolidation or otherwise) of one or more subsidiaries of Hazel if substantially all of the assets of Hazel and its subsidiaries taken as a whole are held by such subsidiary or subsidiaries, except where such sale, lease, transfer, exclusive license or other disposition is to a wholly owned subsidiary of Hazel.

10.22 **DIP Credit Facility**: The Debtor's postpetition financing provided by the DIP Lenders, consisting of a senior secured loan in the aggregate principal amount of $3,000,000.00 (which amount may be increased by up to $1,000,000.00 to a maximum amount of $4,000,000.00).

10.23 **DIP Lenders**: Pontifax Global Food and Agriculture Technology Fund II and its affiliates as managed by Aliment Capital, LLC and S2G Builders Food & Agriculture Fund III, LP and its affiliates.

10.24 **DIP Lenders' Secured Claim**: $3,000,000.00 plus interest as set forth in the DIP Financing Orders and exhibits thereto.

10.25 **Disposable Income**: As defined in section 1191(d) of the Bankruptcy Code, calculated as set forth in **Exhibit E**. Disposable Income for the prior fiscal year shall be determined on June 1 (or such later date on which the Debtor receives its audited financials) based on the Debtor's audited income statement.

10.26 **Disputed Claim**: Any Claim against the Debtor pursuant to section 502 of the Bankruptcy Code that the Debtor has in any way objected to, challenged, or otherwise disputed.

10.27 **Distribution Date**: June 15 of each year in which the Debtor makes Distributions of its Disposable Income to the Holders of Allowed General Unsecured Claims. In the event that the Debtor has not received its audited financial statements by June 1, the Distribution Date shall be fifteen (15) days after the Debtor receives its audited financial statement for the prior fiscal year.

**10.28** **Distributions**: The property required by the Plan to be distributed to the Holders of Allowed Claims.

**10.29** **Effective Date**: The business day the Confirmation Order becomes a Final Order.

**10.30** **Entity**: As defined in section 101(15) of the Bankruptcy Code.

**10.31** **Equity Interest**: An ownership interest in the Debtor.

**10.32** **Estate:** The estate created for the Debtor in the Chapter 11 Case pursuant to section 541 of the Bankruptcy Code,

**10.33** **Exculpated Claim**: Any Claim or Causes of Action whatsoever related to any act taken or omitted after the Petition Date and on or before the Effective Date, arising out of the Chapter 11 Case related to the Debtor, including, without limitation, (i) the negotiation of any settlements entered into, with, or by the Debtor or any Estate representative, (ii) the formulation, preparation, dissemination, negotiation, filing, prosecution, approval or administration of the Plan and/or any debtor-in-possession loans, financing, investment, or sale agreement with respect to the Debtor, and/or (iii) any contract, instrument, release, assignment, or other agreement or document created or entered into in connection with any such negotiations or settlements of the Chapter 11 Case, debtor-in-possession loans, any financing agreement or settlement agreement in connection therewith, the filing of the Chapter 11 Case, the pursuit of Confirmation, and the administration implementation of the Plan.

**10.34** **Exculpated Parties**: The Debtor, its Professionals, the Subchapter V Trustee, and the Debtor's officers and directors who served in such capacity on and after the Petition Date.

**10.35** **Executory Contracts**: All unexpired leases and Executory Contracts as described in section 365 of the Bankruptcy Code.

**10.36** **Existing Investors**: Holders of existing Equity Interests excluding the DIP Lenders.

**10.37** **Fee Application**: Application required to be filed with the Bankruptcy Court and served on all parties required to receive notice, by each Professional who holds a Professional Fee Claim, on or before the Professional Fee Bar Date.

**10.38** **Final Order**: An order or judgment of the Bankruptcy Court that has not been reversed, stayed, modified or amended and as to which (a) any appeal that has been taken has been finally determined or dismissed, or (b) the time for appeal has expired and no notice of appeal has been filed.

**10.39** **General Claims Bar Date**: August 2, 2024.

**10.40** **General Unsecured Claim**: An Unsecured Claim to the extent it is, or has become, an Allowed Claim, which in any event shall be reduced by the amount of any offsets, credits, or refunds to which the Debtor or Debtor in Possession shall be entitled on the Confirmation Date.

**10.41** **Governmental Claims Bar Date**: December 2, 2024.

**10.42** **Holder**: The beneficial Holder of any Claim or Equity Interest, in its capacity as such.

**10.43** **Impaired**: As defined in section 1124 of the Bankruptcy Code.

**10.44** **New Board of Directors**: The new board of directors of the Reorganized Debtor. The New Board shall consist of five members comprised of (i) two representatives designated by Ailment Capital, LLC; (ii) one representative designated by S2G Builders Food & Agriculture Fund III, LP; (iii) the person then serving as the Chief Executive Officer of the Reorganized Debtor; and (iv) one independent director elected by a majority of the outstanding capital stock, voting together as a single class on as-converted to common basis and designated as agreed upon by the stockholders pursuant to the Shareholder Agreements, which will be amended and filed as part of the Plan Supplement. Each member of the Board of Directors shall serve in accordance with applicable non-bankruptcy law and the Debtor's certificate or articles of incorporation and bylaws (which shall be amended to prohibit the issuance of non-voting shares), as each of the same may be amended from time to time.

**10.45** **New Preferred Shares**: A newly authorized class of Series AA Preferred Participating Stock in the Reorganized Debtor.

**10.46** **New Preferred Shares Infusion**: Up to Seven Million Dollars ($7,000,000.00) but at least Five Million Dollars ($5,000,000.00) to be paid to the Reorganized Debtor by the New Preferred Shares Participants on the Effective Date.

**10.47** **New Preferred Shares Participants**: The DIP Lenders and any Existing Investors electing to participate in the New Preferred Shares Infusion.

**10.48** **Original Purchase Price**: The price per share of the New Preferred Shares based upon a fully-diluted pre-money valuation of $1.0 million (including an unissued and unallocated employee stock incentive plan pool representing 7.5% of the fully-diluted post-money capitalization).

**10.49** **Payment Period**: The time period in which the Plan provides for the payment of allowed administrative, priority, and general unsecured claims from the Reorganized Debtor's disposable income, as defined in section 1191(d) of the Bankruptcy Code, which shall be over a period up to five years after the Effective Date or until such claims are paid in full, whichever is earlier.

**10.50** **Petition Date**: June 3, 2024, the date the chapter 11 petition for relief was filed.

**10.51** **Plan**: This Plan, either in its present form or as it may be altered, amended, or modified from time to time.

**10.52** **Plan Supplement**: The compilation of documents and forms of documents, schedules, and exhibits to the Plan, to be filed at least seven (7) calendar days before the deadline to object to the Plan, and any additional documents or schedules filed before the Effective Date as

supplements or amendments to the Plan Supplement. The Debtor shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date, subject to any applicable contractual consent requirement.

10.53 **Priority Tax Claim**: Unsecured income, employment, and other taxes described by section 507(a)(8) of the Bankruptcy Code.

10.54 **Priority Unsecured Claim**: As defined in sections 507(a)(1), (4), (5), (6), and (7) of the Bankruptcy Code.

10.55 **Professional**: Any person or Entity employed by the Debtor in accordance with sections 327, 328, or 1103 of the Bankruptcy Code, and who shall be compensated for services rendered prior to and including the Effective Date, pursuant to Sections 327, 328, 329, 330, or 331 of the Bankruptcy Code.

10.56 **Professional Fee Bar Date**: The first business day that is sixty (60) days after the Effective Date or such other date established by Final Order of the Bankruptcy Court.

10.57 **Professional Fee Claims**: An Administrative Claim for reasonable compensation of a Professional for services rendered or expenses incurred in the Chapter 11 Case on or prior to the Effective Date.

10.58 **Proof of Claim**: A Claim filed against the Debtor in the Chapter 11 Case.

10.59 **Record Date**: 12:00 PM New York time on the date on which this Plan is filed.

10.60 **Rejected Contract**: An Executory Contract deemed rejected effective as of the Effective Date or such other date as may be agreed to by the parties to the Executory Contract or as ordered by the Bankruptcy Court.

10.61 **Rejection Claim**: Any Claim arising from a Rejected Contract, which is a General Unsecured Claim.

10.62 **Reorganized Debtor**: The Debtor after the Effective Date.

10.63 **Schedules**: Schedules and Statement of Financial Affairs, as amended, filed by the Debtor with the Bankruptcy Court listing liabilities and assets.

10.64 **Secured Claim**: A Claim that is secured by a lien (which is valid, perfected, and enforceable under application law or by reason of a Final Order) on the property in which the estate has an interest or that is subject to a set off under section 553 of the Bankruptcy Code, to the extent of the value of the collateral, as determined in accordance with section 506(a) of the Bankruptcy Code, or to the extent of the amount subject to setoff.

10.65 **Subchapter V Trustee**: Jami Nimeroff of Brown McGarry Nimeroff, the trustee appointed pursuant to 11 U.S.C. § 1183(a) and whose duties are prescribed under 11 U.S.C. 1183(b), the Plan, or the order confirming the Plan.

**10.66** **<u>Unimpaired</u>**: an Allowed Claim or Equity Interest that is not Impaired.

**10.67** **<u>United States Trustee or U.S. Trustee</u>**: the United States Trustee appointed under section 591 of title 28 of the United States Code to serve in the District of Delaware.

**10.68** **<u>Unsecured Creditor</u>**: Any Creditor that holds a Claim in the Chapter 11 Case which is not a Secured Claim.

[<em>Remainder of page left intentionally blank</em>]

Respectfully submitted,

**JENNER & BLOCK LLP**
Catherine L. Steege (admitted *pro hac vice*)
Melissa M. Root (admitted *pro hac vice*)
353 N. Clark Street
Chicago, Illinois 60654
Telephone: (312) 222-9350
Email: csteege@jenner.com
Email: mroot@jenner.com

*Counsel for the Debtor and Debtor in Possession*

**KLEHR HARRISON HARVEY BRANZBURG LLP**
Michael W. Yurkewicz (DE Bar No. 4165)
Domenic E. Pacitti (DE Bar No. 3989)
919 N. Market Street, Suite 1000
Wilmington, Delaware 19801
Telephone: (302) 426-1189
Facsimile: (302) 426-9193
Email: myurkewicz@klehr.com
Email: dpacitti@klehr.com

-and-

Morton R. Branzburg (admitted *pro hac vice*)
1835 Market Street, Suite 1400
Philadelphia, Pennsylvania 19103
Telephone: (215) 569-3007
Facsimile: (215) 568-6603
Email: mbranzburg@klehr.com

Dated: September 27, 2024